## STEEL WHEEL CORPORATION v. B. F. GOODRICH RUBBER CO.

### No. 5362.

Circuit Court of Appeals, Sixth Circuit.

June 28, 1930.

W. J. Belknap, of Detroit, Mich., and John Weld Peck, of Cincinnati, Ohio (Lewis T. Greist, of Chicago, Ill., and Whittemore, Hulbert, Whittemore & Belknap, of Detroit, Mich., on the brief), for appellant.

M. E. Clark, of New York City (Charles Neave, of New York City, Robt. M. Pierson, of Akron, Ohio, Fish, Richardson & Neave, of New York City, and Swan & Frye, of Detroit, Mich., on the brief), for appellee.

Before DENISON, MOORMAN, and HICKENLOOPER, Circuit Judges.

HICKENLOOPER, Circuit Judge.

Appellant brought action in the District Court for the infringement of patent No. 1,537,879, issued May 12, 1925, upon application of Alden L. Putnam, for a pneumatic-treaded vehicle wheel. Claims 1 and 2 are in issue, and are quoted in the margin.[1] The lower court held such claims invalid, and dismissed the bill. Plaintiff appeals.

The validity of this patent is challenged upon many grounds, the most serious of which are anticipation, prior uses, and publications, and the alleged defect of indefiniteness in the claims themselves. Before passing to a consideration of the other defenses, it is desirable to consider first the construction to be placed upon the claims. This includes the defense of indefiniteness.

Prior to Putnam it was customary practice in this country to shoe automobiles with so-called high pressure tires of no larger cross-sectional area than would reasonably stand up under use at inflation pressures of from 40 to 85 pounds for passenger cars, and from 70 to 110 pounds for motortrucks, such tires increasing in diameter and inflation pressure with progressive increases of the load. These were built with stiff side walls of sufficient thickness to withstand the pressures to which they were to be inflated. The general principles were then well known to the engineers of the trade, however, that, as cross-sectional area was increased for a given load, inflation pressure might be decreased without injury to the tire; and that the only requirement as to side-wall thickness was that the side walls must have sufficient strength to withstand the internal pressure even when subjected to violent blows and jars. There was a "standard practice," or general recommendation, as to maximum load

---

[1] "1. A pneumatic tire of normally circular cross-section and designed to carry a predetermined normal load at a substantially reduced inflation pressure modified from standard practice for the same load by a substantial increase in cross-sectional area and a substantial decrease in ratio of wall thickness to cross-sectional diameter.

"2. A pneumatic tire of normally circular cross-section and designed to carry a predetermined normal load at a substantially reduced inflation pressure, modified from standard practice for the same load by an increase of at least 50 per cent in cross-sectional area and a substantial decrease in the ratio of wall thickness to cross-sectional diameter."

and corresponding air pressure for each size of tire, but no proved "standard practice" as to air pressure for larger tires when used with much smaller loads, nor for the maximum size of tire permissible for a given load. Thus the "standard practice" schedule fixes the maximum load per 5-inch cord tire at 1,700 pounds and the corresponding air pressure at 80 pounds, but is entirely silent as to recommended air pressure when a 5-inch cord tire is used for a load of but, say, 850 pounds, or even less.

■ Putnam's idea was based upon the known principle above stated, that, with an increase in cross-sectional area, inflation pressure for the same load might be lowered; and the also known fact that larger tires than were customarily used, inflated to a lower pressure than required for their maximum loads, produced easier riding qualities. The claims in suit are for a tire as an article or product of manufacture. As such, they must "particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery." Rev. St. § 4888 (35 USCA § 33). The claims, when read in the light of the specification, are the definition of the scope of the patent. In them alone we must find the requisite novelty and utility; and, in an article patent, this novelty must reside in the article itself—in the combination of elements stated as making up the whole—and not merely in the standardized use of such article. Nor may we look to mere statements of function to supply omitted elements or disclose novelty where the article is used for the same old purpose. Such statements may be descriptive of the nature, use, or operation of the elements named, but cannot supply such elements nor be construed to cover all structures by which the given results may be attained. How, then, are the claims here limited?

The claims in suit call simply for a pneumatic tire of normally circular cross-section, modified from "standard practice" for the same load (1) by a substantial increase in cross-sectional area and (2) a substantial decrease in ratio of wall thickness to cross-sectional diameter. It is true they also contain the phrase "designed to carry a predetermined normal load at a substantially reduced inflation pressure," but the purport of this is purely functional, and it can add nothing to the claim descriptive of the elements called for. These claims are attacked for indefiniteness both because of the use of "substantial" and the use of a supposed "standard practice" to show the novel variation.

Putnam doubtless had in mind an actual decrease in wall thickness for tires of the same diameter in customary use, and the use of larger tires of such type where smaller ones had theretofore been used, for he says in the specification that he has reorganized the entire wheel, "increasing the cross-sectional diameter of the tire relative to the circumferential diameter thereof * * * and correspondingly decreasing * * * the thickness of the fabric walls of the tire." But the claims do not so state. There was no "standard practice" for wall thickness. There was no "standard practice" for the *minimum load* to be used with any particular size of tire. The "standard practice" had to do only with the maximum load for a given size and the pressure required for such size and load. Even conceding, therefore, that the patent is addressed to those skilled in the art, and that to them there would be no difficulty in discerning the dividing line between an increase which is, or is not, substantial (cf. Eibel Process Co. v. Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523), which is somewhat difficult here because of continual "over-sizing," still there remains an insuperable indefiniteness in what was "standard practice" as to wall thickness and as to the maximum size of tire to be used with any given load. The claims read directly upon the substitution of a 5-inch tire upon the lightest of cars, in place of the former 4-inch tire, or the substitution of a 7-inch tire upon a heavier car, in place of a 5-inch, even though there were no actual change in wall thickness involved in making the substitution, yet this is a mere change in size, unpatentable, and as to which there is no "standard practice" in evidence.

But conceding further that the claims may be read as requiring, not only a decrease in ratio of wall thickness to cross-sectional area, below the ratio of the smaller tires of the supposed "standard practice," but also a decrease below the ratio which was theretofore "standard practice" in tires of the same larger size, that is, a decrease in actual wall thickness as between the new and old tires of the same diameter, and that there was something more in this step than mere craftsmanship and the adaptation of the wall thickness to the pressure the tire was designed to hold, yet there was nothing new in such a pneumatic tire, as a tire. The airplane tires in common use long before Putnam's application date answer every call of the claims, increase in cross-sectional area and decrease in ratio of wall thickness below that of other commonly used tires of the same size. It is argued that these tires are not "automobile

road tires" because they have no treads, breaker strips, or other characteristics of automobile tires. Yet it was clearly and convincingly proved that the witness Mulford so used them more than two years prior to Putnam's application.

Furthermore, every disclosure which can reasonably be gleaned from the patent in suit, certainly the precise combination of elements found in the claims, is also found in the French patent to Perrot, No. 489,671, March 1, 1919. Here again it is said that this is not a "road" tire, and would not stand up under heavy use; but the patent in suit does not teach even those skilled in the art how to make a "road" tire, the number of plies of reinforcing cords which it is necessary to use, the use of breaker strips, the nature and method of attaching the tread, etc. The claims depend for their novelty merely upon an increase in cross-sectional area, without increase in outside or circumferential diameter, and a decrease in ratio of wall thickness to cross-sectional diameter, because of which elements the supposedly new tire has the function of lower inflation pressure required and easier riding qualities. So considered, the Perrot patent is a complete anticipation —the Mulford use of the airplane tires upon his "special" a clearly and convincingly proved prior use, without regard to his similar use of the Brender tires. The latter we also consider as sufficiently clear in proof and as constituting an additional prior use which would defeat the patent, were recourse to it necessary.

Under the foregoing circumstances, we consider it unnecessary to discuss in detail the defenses based upon the prior publications relating to the Palmer tire; the other miscellaneous prior publications; the United States patent to Hawley, No. 1,433,008; application December 10, 1917, antedating Putnam; the prior practice of "over-sizing"; the Marks use of the Palmer tire in this country in 1910; or the question of infringement. It is sufficient to say that practically all of these support and, possibly, each sustains the contention of defendant that, if the claims be given their obvious construction, and if they call for more than mere changes in size, plus common mechanical skill in designing, yet Putnam was not the first and original inventor. While the question of anticipation by prior patent is largely one of law, the questions of prior invention, reduction to practice, and prior use are questions of fact, upon which we are thoroughly convinced in this case, without giving to the opinion of the learned District Judge, who has heard the witnesses, that persuasive force to which it is entitled.

Much is said by the plaintiff of Putnam's contribution to the art, and of how he had revolutionized the entire tire industry; and emphasis is placed, throughout, upon the supposed generic difference between "balloon" tires and "high pressure" tires. We do not think that the differences between the two are generic in this broad sense, or that the claims cover such generic difference, if it exists. But, even if they did, this could have no bearing whatever upon the questions of anticipation or of prior uses and publications. The contribution of Putnam to the art lay altogether in persuading the automobile, tire, and rim industries to adopt his ideas as to size of tires. That, lacking Putnam's demonstration and persuasive powers, these prior uses and publications did not materially affect the trade, does not alter the intrinsic nature of the use nor the scope of the publication.

The decree of the District Court is affirmed.